Summons Issued SEA 20000 7424

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

SEATTLE DIVISION

| | |
|---|---|
| BENJAMIN JOSEPH LIGERI, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 2:25-cv-00764-SKV |
| ) | |
| AMAZON.COM SERVICES LLC, ) | |
| AMAZON PAYMENTS, INC., ) | |
| ) | |
| Defendants. ) | |
| ) | |

# COMPLAINT FOR CIVIL RICO, CONVERSION, FRAUD, AND DECLARATORY & INJUNCTIVE RELIEF

## INTRODUCTION

1. Over the course of multiple years, Defendants orchestrated a sophisticated scheme to unlawfully seize, convert, and control the cash flow, inventory, and brand equity of Plaintiff and his affiliated businesses. Under false pretenses—including fraudulent bank debits, deceptive internal investigations, sham account closures, coercive arbitration, and targeted surveillance—Amazon engineered a system of economic entrapment.

This is not isolated misconduct. It is Amazon's post-Bezos business model: fabricate profitability by confiscating third-party cash and inventory, inflating its balance sheet with funds and goods it does not own, and reporting these as earned revenue.

This scheme includes a constellation of coercive tools: recursive fund reserves that re-seize already-cleared earnings, inventory removal blocks that trap merchandise while charging storage fees, and "limited restock" policies that strangle best-selling products by capping inbound shipments below demand, and full-on account deactivation accompanied by total cash and inventory seizures whenever Amazon can identify a seemingly plausible—but entirely arbitrary— pretext for such extreme measures.

In each case, Amazon acts as gatekeeper, creditor, competitor, and executioner— crippling sellers while duplicating their products and monopolizing the market infrastructure those sellers helped build. These are not chargebacks or isolated disputes. Amazon routinely empties entire account balances—sometimes in the tens of thousands of dollars—held in trust and earmarked for disbursal, while simultaneously seizing hundreds of thousands of dollars in inventory with no process, justification, or remedy. Amazon is not the owner or even leaseholder of this inventory; it functions merely as a third-party fulfillment warehouse contractually obligated to ship goods on demand.

Shareholders are misled into believing Amazon is thriving on operational excellence, when in fact its apparent growth is propped up by systemic robbery of sellers. Entire law firms and other non-legal agencies now market themselves around recovering stolen assets from Amazon—often compounding harm by charging fees atop already devastating losses and providing no success.

Meanwhile, Amazon allows massive platforms like Flippa and Empire Flippers to openly broker seller accounts—penalizing such transfers only when convenient, especially when significant balances or inventory are involved. The ambiguity is not incidental. It is intentional—a weaponized loophole used to justify arbitrary enforcement, maximize asset seizures, and preserve the illusion of integrity while engaging in industrial-scale theft. Every seller on Amazon is effectively blacklisted— it's just a question of when Amazon decides to act on that pretext, and how much it can extract when it does.

## JURISDICTION AND VENUE

2. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question), 18 U.S.C. § 1964(c) (civil RICO), and 28 U.S.C. § 1367 (supplemental jurisdiction over state law claims).

3. Venue is proper under 28 U.S.C. § 1391(b), as Defendants reside in and maintain their principal place of business in this District, and a substantial part of the events giving rise to these claims occurred here. Plaintiff also selects this venue to avoid the dilatory tactics Amazon routinely employs to change venue in other jurisdictions. Litigating in Amazon's home district, where arbitration proceedings were also held, will serve judicial economy and prevent unnecessary procedural disputes.

## PARTIES

4. Plaintiff Benjamin Joseph Ligeri is a natural person and resident of Florida. He is the sole owner of multiple business entities affected by Amazon's scheme, including Central Concepts, Inc., Global Specialty Products LLC., and Melbourne Retail LLC.

5. Defendant Amazon.com Services LLC is a Delaware limited liability company with headquarters in Seattle, Washington. It operates Amazon's online marketplace and enforces policies against sellers.

6. Defendant Amazon Payments, Inc. is an affiliated entity responsible for managing payments, disbursements, and financial enforcement within Amazon's commercial platform.

## THE AMAZON ENTERPRISE

7. Defendants form an association-in-fact enterprise ("Amazon Enterprise") within the meaning of 18 U.S.C. § 1961(4). Each Amazon entity had a specific role:

   a. Amazon.com Services LLC implemented account enforcement decisions, internal investigations, and deactivations.

   b. Amazon Payments, Inc. executed debits, froze accounts, and withheld funds based on enforcement triggers.

8. The Amazon Enterprise had a common purpose: to fabricate profitability by seizing and withholding cash and inventory from sellers based on contrived policy

violations, rather than any actual breach of law or contract. These violations are almost always vague and entirely baseless — fabrications of wrongdoing equivalent to a modern-day witch trial — serving primarily as fraudulent pretexts for asset confiscation.

9. Defendants repeatedly engaged in wire fraud, in violation of 18 U.S.C. § 1343, by using interstate electronic communications to carry out their scheme to seize money and property from sellers under false pretenses. This included sending emails and account notifications that misrepresented the basis for account closures, inventing violations to justify withholding earned disbursements, and initiating unauthorized bank debits through ACH and other wire systems. These communications and transactions were essential to the enterprise's operation and resulted in the unlawful acquisition of hundreds of thousands of dollars from Plaintiff alone and the forced lay off of numerous hardworking Americans.

## PATTERN OF RACKETEERING ACTIVITY

10. Between 2023 and 2025, the Amazon Enterprise committed multiple predicate acts of wire fraud and bank fraud targeting Plaintiff and his affiliated businesses.

11. On July 13, 17, and 19, 2023, Defendants debited $1,539.99, $1,732.49, and $3,464.98 respectively from the Chase account of Global Specialty Products LLC while litigation was pending in the U.S. District Court for the District of Connecticut. These transactions occurred without notice or judgment. (See Exhibit E).

12. On March 11 and 14, 2025, after arbitration hearings rested between Amazon and Melbourne Retail LLC, and while pending deliberation by the arbitrator, Defendants attempted to debit $7,284.94 and $1,821.24 from Melbourne's Chase business account. Both attempts were flagged as fraud by Chase. (See Exhibit A; Exhibit C).

13. On March 25, 2025 — just five days after the arbitrator issued a decision that denied Amazon's baseless counterclaim for damages but nonetheless allowed Defendants to retain tens of thousands of dollars in seized funds — Amazon sent a payment demand email to Plaintiff. The message falsely claimed an outstanding balance was owed, even though the arbitration had explicitly rejected Amazon's claim for damages. This demonstrates Defendants' bad faith disregard for the very forum they contractually impose, weaponizing arbitration outcomes only when favorable, while ignoring them when inconvenient. (See Exhibit G).

14. Defendants withheld approximately $30,000 from Melbourne Retail LLC in "account reserves," while also seizing approximately $70,000 from Plaintiff's Health and Household account, and over $50,000 from an Amazon account operated by Vanguard — a company later acquired by Plaintiff's business, Global Specialty Products LLC. These funds were taken without any legitimate cause, legal process, or adjudication of wrongdoing. (See Exhibit D).

15. The scheme began with the deactivation of Plaintiff's original Amazon account, operated by C Corp, Central Concepts, Inc., on January 20, 2023, based on an alleged link to an Amazon store known as "Arizona Corp," which operated on the other side of the country. While Amazon claimed there was a connection between the accounts, Plaintiff never operated, controlled, or held any ownership or financial interest in the Arizona Corp account, which he later found out was owned by an individual known as Emily Muradyan. The deactivation was issued without notice, process, or any legitimate opportunity to dispute the allegation. Plaintiff submitted legal documents and sworn affidavits to disprove any relationship but was repeatedly met with generic responses such as "we need more information" — part of Amazon's stock pattern of fabricated, automated denials designed to insulate its enforcement decisions from scrutiny.

16. In one illustrative instance of Amazon's predatory conduct, Plaintiff operated a top-selling Amazon listing under the 'PrimeMed' brand for a new multi-purpose form of injection molded plastic medicine cups, featuring unique product photography and copyright-protected copy. Amazon subsequently created a nearly identical product listing, replicating the copyrighted language and commercial presentation, and promoted theirs in a brand-new top-of-page placement above even the sponsored ads paid section. Amazon's duplicate listing was not advertised under generic search terms like 'medicine cups,' but exclusively in response to branded searches for 'PrimeMed medicine cups' — demonstrating a targeted attempt to hijack Plaintiff's brand equity, siphon goodwill, and replace a successful brand that everyone loved with its own fake knockoff version that did not even serve the purpose they were duplicating the selling features of.

17. In another pattern act, Plaintiff repeatedly attempted to authorize a legitimate wholesaler, Duke's Deals, to sell Green Sky–branded products using formal trademark authorization letters, including one issued by the attorney of record for the Green Sky trademark. Despite this legal documentation and Plaintiff's uncontested ownership of the brand Green Sky, Amazon rejected the authorization, citing vague and conflicting internal policies such as "not accepting brand

applications at this time" or "this letter of authorization is just simply not acceptable" with no further explanation. Simultaneously, Amazon permitted unvetted and clearly unauthorized third-party sellers to continue listing on the Green Sky trademark page without any form of authorization and after being properly reported as infringers using Amazon's Report Infringement tools. This was not merely administrative dysfunction as Amazon would like us to believe—it was a targeted maneuver to prevent brand control by the rightful owner while preserving chaos that enabled brand dilution and eventual Amazon-controlled brand hijacking. Anytime ownership is unclear, Amazon has the means to verify it by sending a verification code to the trademark attorney of record — a method they used in other contexts. But in these cases, it didn't benefit their goal to replace the USPTO and assume the goodwill of the mass of everyone's brands so it was not employed. This intentional failure to engage known validation protocols reflects a pattern of obstruction, not enforcement. (See Exhibit L).

18. Amazon also weaponizes its fulfillment system to deliberately obstruct Plaintiff's ability to recover inventory, imposing arbitrary and contradictory removal blocks with no rational basis. As shown in Exhibit M, Amazon marks inventory as "not available for removal" even when units are clearly present and accounted for—sometimes listing more units as blocked than even exist. This practice is not an error; it is a calculated tactic of economic coercion, designed to trap sellers in a state of dependence, incur mounting storage fees, and punish brand owners seeking autonomy. It reflects a broader strategy of malicious interference, using systemic logistical manipulation to cripple businesses from within.

19. Amazon's reserve policies, while outwardly framed as risk management, operate with opaque logic and predatory impact. Plaintiff experienced recurring cycles in which Amazon withheld tens of thousands of dollars in reserve, far exceeding any plausible risk of returns. Even more insidious is Amazon's recursive reserve behavior. For example, Plaintiff entered a settlement cycle with $18,000 marked as "available" for disbursement. After generating $30,000 in new sales—yielding $15,000 in net receivables—Amazon not only withheld the full $15,000 under the pretext of potential returns but also clawed back an additional 20% of the previously cleared $18,000, effectively re-reserving funds that had already passed Amazon's own holding thresholds. This mechanism creates a financial ouroboros: a self-consuming reserve loop where each new sale triggers not only a freeze on all current earnings, but a retroactive devaluation of past earnings already cleared by an already absurd logic. It is not a reserve—it is a recursive seizure engine designed

to suppress liquidity, fabricate cash on Amazon's books, and exert coercive pressure over third-party sellers under the guise of routine disbursement policy.

20. Amazon disproportionately targets legacy seller accounts—those established before 2017—for accelerated deactivation and fund seizure. These older accounts operated under previous *Business Solutions Agreements* which allowed full payout of net receivables without imposed reserves. Amazon has methodically purged legacy accounts, invoking vague or contrived violations as cover to freeze or seize funds—bypassing even its own reserve logic, because no such mechanism applied to these older contracts. This selective enforcement reveals a calculated strategy: eliminate accounts that cannot be financially manipulated through Amazon's evolving reserve schemes, and force migration into systems that give Amazon maximum financial control. It is not policy enforcement—it is legacy cleansing by economic force.

21. Amazon further damaged Plaintiff through its weaponization of inventory restrictions, particularly under the so-called "Limited Restock" policy. In this scheme, even when Plaintiff's products were selling at high velocity—sometimes over 300 units per week—Amazon arbitrarily capped inbound shipments at 200 units or less, choking sales momentum and triggering stockouts. In multiple cases, Amazon blocked Plaintiff from sending any replenishment inventory at all, citing that fulfillment centers were "restricting that type of item," regardless of the product's sales rank, consumer demand, or historical performance. Simultaneously, Amazon penalized Plaintiff for "underutilizing storage space" or being "understocked," creating a no-win scenario designed to financially impair compliant sellers. These contradictory systems—punishing both overstock and understock, while physically preventing restock—form a textbook pattern of economic sabotage. Amazon's manipulation of inventory thresholds and shipment permissions was not driven by logistics but by leverage: it served as a calculated tool to suppress competition, force stockouts, and systematically redirect market share from third-party sellers to Amazon-owned or Amazon-favored entities.

## INJURY AND CAUSATION

22. Plaintiff suffered financial injuries exceeding $250,000, including:

   a. $33,290.32 withheld from Melbourne Retail LLC;

   b. Approximately $70,000 withheld from the Health and Household account;

c. Additional sums of over $50,000 debited from Global Specialty Products LLC;

d. Over $300,000 in inventory destroyed or returned in unusable condition by Amazon, including shipments sent back in disorganized envelopes requiring labor-intensive processing or disposal;

e. Time, labor, and opportunity loss from repeated account terminations.

23. In addition to the above losses, Plaintiff experienced long-term commercial harm amounting to tens of millions of dollars in lost revenue due to Amazon's systemic sabotage. This included the abrupt and repeated deactivation of thriving accounts, Amazon's hijacking and replication of Plaintiff's branded listings, and the suppression or permanent "tombstoning" of top-performing products without cause or process. These coordinated actions destroyed organic ranking, collapsed momentum from paid ad campaigns, and severed key wholesale and retail relationships. In many instances, Amazon erased Plaintiff's listings only to promote virtually identical Amazon-controlled versions in their place, using the same keywords, style, or even product architecture. These actions were not isolated—they reflect a long-standing strategy of commercial erasure aimed at stripping successful sellers of their market position and repackaging their intellectual capital as Amazon property.

24. These injuries were caused directly by Defendants' racketeering acts and satisfy the standard in Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639 (2008).

## CLAIMS FOR RELIEF

### Count I: Civil RICO (18 U.S.C. § 1962(c))

25. Plaintiff realleges the above paragraphs.

26. Defendants conducted and participated in the affairs of an enterprise through a pattern of racketeering activity, including acts of wire fraud and bank fraud.

27. Plaintiff was directly injured by Defendants' conduct and is entitled to treble damages, costs, and attorney's fees under 18 U.S.C. § 1964(c).

28. Defendants' conduct constitutes at least two predicate acts of wire fraud within a 10-year period, as required under 18 U.S.C. § 1961(5).

### Count II: Conversion

29. Defendants wrongfully exercised dominion over Plaintiff's business funds without lawful justification.

### Count III: Fraud

30. Defendants made false representations of authority to debit Plaintiff's accounts and collect funds post-arbitration.

### Count IV: Declaratory Relief

30.

   a. Defendants had no legal basis to debit or withhold any funds from Plaintiff or his affiliated business entities under the pretext of policy violations that were fabricated, unadjudicated, or arbitrarily applied;

   b. Defendants' systemic use of undisclosed or post hoc enforcement mechanisms—such as recursive reserves, inventory removal blocks, and "limited restock" policies—violates the contractual expectations, due process rights, and commercial reasonability owed to sellers under Amazon's own Business Solutions Agreement (BSA);

   c. Amazon's refusal to validate legitimate brand ownership using known protocols (e.g., USPTO verification through attorney of record) constitutes a pattern of obstruction and tortious interference;

   d. Amazon's pattern of account deactivations, payment withholdings, and asset seizures based on vague or unverified triggers constitutes a misuse of platform authority inconsistent with federal commercial norms; e. Defendants are judicially estopped from pursuing additional enforcement actions or payment demands arising from the same factual basis previously resolved in arbitration or administrative proceedings.

## PRAYER FOR RELIEF

Plaintiff respectfully requests:

A. Judgment against Defendants for RICO violations;

B. Treble damages under 18 U.S.C. § 1964(c);

C. Declaratory and injunctive relief barring further unauthorized debits;

D. Restitution and compensatory damages for all seized or withheld funds;

E. Costs and further relief as the Court deems just.

## EXHIBIT INDEX

Exhibit A – Chase Fraud Notifications (Melbourne attempted debits – March 11 & 14, 2025)

Exhibit B – AAA Arbitration Award (Melbourne Retail LLC – March 20, 2025)

Exhibit C – Timeline of Key Events (Arbitration hearing, debits, award)

Exhibit D – Amazon Charges + Reserve Withholding

Exhibit E – Chase Bank Statement – Global Specialty Products LLC (July 2023 Debits – Redacted)

Exhibit F – Docket Caption – U.S. District Court of Connecticut

Exhibit G – Amazon Payment Demand Email (March 25, 2025)

Exhibit H – $3,000 Transfer from Benjamin Ligeri to Melbourne Retail LLC

Exhibit I – Central Concepts Deactivation Notice (January 20, 2023)

Exhibit J – Marketplace of Amazon FBA Businesses on Flippa

Exhibit K – Seller Defense Ad by Law Firm CJ Rosenbaum

Exhibit L – One of the Many Authorization Letters for Duke's Deals

Exhibit M – Example of the Inventory Removal Scheme

Respectfully submitted,

/s/ Benjamin Joseph Ligeri

Benjamin Joseph Ligeri (Pro Se)
3120 Corey Rd
Malabar, FL 32950
321-831-2595
benligeri@gmail.com

Date: _4-25-25_